FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA   99 MAR 31 PM 4: 16
SOUTHERN DIVISION
U.S. DISTRICT COURT
N.D. OF ALABAMA

RICKY L. YOUNG,                    ]
                                   ]
        Plaintiff,                 ]
                                   ]
    vs.                            ]   CV 98-N-1168-S        ENTERED
                                   ]
WOLVERINE TUBE, INC.,              ]                        MAR 3 1 1999
                                   ]
        Defendant.                 ]

**Memorandum of Opinion**

### I. Introduction.

In this suit, Ricky L. Young ("Young"), brings suit against his former employer Wolverine Tube, Inc. ("Wolverine"), pursuant to Title VII, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981 for the termination of his employment based on racial discrimination. Mr. Young was terminated after he tested positive for marijuana. He claims, however, that his termination represents disparate treatment because similarly situated white employees were not fired upon testing positive for controlled substances, and some were given a second drug test to confirm the first. He also alleges that his ties to the attempted formation of a union at the Wolverine plant gave the administration the opportunity to discriminate against him on the basis of his race.

This matter is presently before the court on Wolverine's motion for summary judgment, filed November 27, 1998. The issues have been briefed by the parties. However, Mr. Young's response failed to address the undisputed facts submitted by Wolverine pursuant to Exhibit D of this court's Initial Order. *See Order of May 18, 1998*. Because of

this failure the court has deemed these facts undisputed.[1] However, considering that the plaintiff is prosecuting this case *pro se*, the court has also carefully studied the evidence and has assured itself that the defendant's version of the facts is amply supported by the evidence. Upon due consideration, the motion will therefore be granted.

## II. Statement of the Facts.

Wolverine formulated a new drug policy, which included provisions for random testing,[2] in January of 1990.[3] Pursuant to those provisions, Mr. Young was randomly selected on May 5 or 6, 1997 to be one of approximately forty-five employees of Wolverine to be drug tested. The list from which Mr. Young's name was taken was created by Thomas Stanley Beasley on October 24, 1996.[4] Consistent with Wolverine's drug policy, Mr. Young submitted to giving a urine sample, and completed the requisite Consent and Disclosure

---

[1] Because the plaintiff failed to respond to these facts, they are deemed admitted for summary judgment purposes. *See Initial Order*, May 18, 1998, exhibit D at 4; *see also FTC v. Febre*, 128 F.3d 530, 535-36 (7th Cir. 1997). However, these are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] Wolverine has different types of drug tests that it will conduct from time to time. These are the random test, the reasonable cause test, the pre-employment test, and the post-accident test. The procedures for these tests are different, as post-accident tests involve a more invasive blood test to determine blood alcohol level. *See Fuller Aff.* Random tests are run only for drugs, and only on urine specimens. This fact may have created a rumor that a second, more accurate blood test was made available to some employees but not others, generating some of Mr. Young's complaints. *See infra* note 5. In fact, the GC/MS urine test is apparently the most accurate drug test available. *See id.*

[3] The drug-free work place policy became effective January 2, 1990. Since its implementation, every employee that has tested positive for a controlled substance has been terminated. Fourteen employees, 11 Caucasians and 3 African-Americans, have been terminated since January 2, 1990. *See Fuller Affidavit* and accompanying exhibits.

[4] The list, compiled by Mr. Beasley at the request of Wolverine's Human Resource Manager, Kim Fuller, was created using a standard program called the Random Drug Test Selection Program. This program begins with certain skill codes (e.g. forklift operation), picks a list of all employees with that skill code out of a database by I.D. numbers, matches those I.D. numbers with names by accessing a second database, and then uses an IBM-created random number generation package to select particular employees to be tested. *See Beasley Affidavit.* Mr. Young's name was returned on a list of forklift operators to be randomly tested. *See id.*; *see also infra* note 6.

2

Form, as well as the Specimen Control form. The representatives from Decatur General Hospital who administered the test sealed the urine sample and placed it in a separate security bag, all in the plaintiff's view.

The bag containing the urine vile was then released to the technicians at LabSouth, Inc., whose toxicology department conducted the actual tests to see if any controlled substances were present. The initial screening test conducted by LabSouth revealed a positive result for marijuana in Mr. Young's urine. As is their policy for positive samples, LabSouth confirmed their initial results with a GC/MS test[5] and found the presence of marijuana metabolites.

On May 8, 1997, Kim Fuller, Wolverine's Human Resources Manager, and Wade German, the supervisor of Mr. Young's department, met with the plaintiff to inform him that his drug screening revealed a positive result for marijuana. As is the practice of Wolverine, Mr. Young was suspended until the written results were received from LabSouth. When the result arrived on May 13, 1997, Mr. Young again met with Ms. Fuller and Mr. German and was allowed to resign rather than be terminated.

Mr. Young filed a charge of discrimination with the EEOC on July 21, 1997. The EEOC sent the plaintiff a notice of his right to sue on October 6, 1997. He brought this

---

[5]GC/MS stands for the gas chromatographic and mass spectrometric test. This test is considered the ultimate method for detecting and measuring amounts of controlled substances, and is therefore used as a back-up for the faster but less accurate screening test. *See Huber Aff.* In the interim between the two tests, the employee is suspended. After Wolverine receives a positive GC/MS test result, the employee is terminated. *See Fuller Affidavit.* It is therefore possible for an employee to have a positive screening test, be suspended, and then be reinstated after the GC/MS test indicates that the initial test was erroneous. Indeed, it appears that this may have happened to one of the employees named by Mr. Young. *See infra* at 5. Anyone familiar with the childhood game of "gossip" can readily see how such facts could lead to a story that some employees were given a second test after the first came back positive. The court suspects that this "second test" may thus be the source of some of the gossip Mr. Young attempted to introduce into evidence.

3

action in the Circuit Court of Jefferson County, Alabama on April 13, 1998 and it was removed to this court on May 11, 1998.

Construing his submissions broadly, Mr. Young appears to advance two arguments that he was treated improperly for racial reasons. He first bases his claim of disparate treatment due to race on allegations that white employees who failed drug tests were given a second test or were not fired after the initial positive results. Mr. Young points to Steve Proctor, Danny Smith, Bob Montgomery, Cecil Turner, Terry Stinson, and Glenn Bradford as examples of white employees who received better treatment.[6]

In connection with both of these claims, Mr. Young also advances evidence of a motive for race discrimination. He argues that a number of black employees at Wolverine were involved in a union organization campaign at the company, and that the company targeted black employees for elimination to stave off a vote on union formation. It is undisputed that the company was involved in a union formation campaign. However, Mr. Young concedes that he was not part of any union organizing effort. He nevertheless claims that he was told that Wolverine's CEO had said at a management meeting that the company was "getting rid of blacks" because of union activity, and that he may have been

---

[6]Mr. Young also suggests that he was placed on the drug testing list improperly, and that the defendant may have manipulated the selection process in order to terminate him. Specifically, Mr. Young points out that he appeared on a random testing list of fork lift operators, though he was not licensed to operate a forklift. However, uncontradicted evidence indicates that the term forklift operator was actually used by Wolverine's computer system to designate any employees authorized to operate mobile equipment. The drug policy in fact covered such "operators of mobile equipment," *Drug Policy ¶ 5.5(2)* (attached as Exh. 1 to *Fuller Aff.*), and most Wolverine employees apparently qualified at one time or another. Once this skill code was entered in Wolverine's system it remained there virtually forever. Thus almost all Wolverine employees, including Mr. Young, had this skill code in their files. *Fuller Aff.* This explains how Mr. Young, an extrusion press operator, showed up on a list of "fork-lift operators." Mr. Young has no evidence to contradict this explanation of Wolverine procedure. Moreover, he accepted this explanation by failing to respond to defendant's factual submissions. *See Plaintiff's Statement of Facts* Nos. 64-67. The undisputed facts thus establish a perfectly innocent explanation for this anomaly.

4

a target of this generalized anti-union/anti-black campaign. *See Defendant's Exhibit 9*; *Depo. of Ricky Young* at 60.

Young's assertions conflict with the documentary evidence before the court, and specifically with Wolverine's employment records. According to those records, *all* employees, both white and black, who have testified positive for drugs since the 1990 implementation of Wolverine's drug policy have been terminated. Indeed, company records indicate that Proctor, Montgomery, Smith, Stinson, and Turner have not failed a drug test administered by Wolverine under its current drug policy. Proctor, Montgomery, and Smith were randomly tested on several occasions, but never tested positive. Stinson's initial screening test from a post-accident drug sample did come back positive, but the follow-up GC/MS test determined that the positive result was caused by his prescription cough medication, not an illegal drug. Turner had alcohol problems, but admitted to them and per Wolverine's policy was given medical leave to attend a rehabilitation program. He therefore did not undergo any drug testing conducted by Wolverine, random or otherwise. In fact, according to Wolverine's records the only employee listed by Mr. Young who did test positive was Mr. Bradford, and the records show that he was terminated after only one positive test. *See Fuller Aff. and exhibits thereto*.

Mr. Young offers little evidence to contradict these records. He essentially admits that he constructed his list of comparators based on "hearsay, common knowledge, and gossip," or in other words the word around the plant, *Depo. of Ricky Young* at 35, and that

5

he has no other evidence that these employees were treated differently.[7] *See id.* It is this

evidence, therefore, on which his claim must either stand or fall.

## III. Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party

asking for summary judgment "always bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of 'the pleadings,

---

[7]The plaintiff did submit a copy of a document apparently signed by Danny Smith which *might* be read to support the plaintiff's allegations. The document indicates that Smith failed a random drug test, and that later on another sample was taken but Smith was told that it was never actually tested. However, the document is plagued by a number of serious problems. First and foremost, it is an unauthenticated copy of what is at best an unsworn, unnotarized statement by a potential witness. It is therefore not proper evidence for submission to the court on summary judgment. Even if these problems of form were overlooked, however, the document would have limited value. Its claim that a drug sample was taken but never tested comes from a supervisor who likely had no involvement in the decision. Presumably he was told by someone, who was told by someone, and so on. It is thus a second-hand story at best, and is not admissible evidence of what happened. The document is also ambiguous in several crucial respects. For example, it is not at all clear when Smith's allegedly positive test occurred. According to the statement, the positive sample was taken "when the drug-free workplace policy was adopted," *Plaintiff's Exhibit 8*, but the dates given, "approx 1987 or 88," *id.*, are well before the current drug policy was implemented in 1990. Thus Smith is either wrong about his dates or wrong about the timing of the test in relation to Wolverine's adoption of a drug policy. This timing is crucial because the company's actions before the policy was implemented shed no light on the key question in this case -- whether Wolverine applied its drug policy in the same way to whites and blacks. While the plaintiff might ordinarily be entitled to the benefit of the doubt in resolving these ambiguities, the court must carry out its promise under its Initial Order and assume that the described "incident, if it occurred, predated the subject drug policy," *Movant's Statement of Facts* No. 57, because plaintiff failed to object to defendant's statement of facts on this point. *See supra* note 1. In light of this assumption, the document proves very little. For all of these reasons, the court chooses to disregard the document for failure to comply with Fed. R. Civ. P. 56(e), though Wolverine has not filed a motion to strike. *See, e.g., United States v. Dibble,* 429 F.2d 598, 602 (9th Cir. 1970) (Wright, J., concurring) ("Inadmissible affidavits are no different from evidence. They may be stricken in the discretion of the trial judge, but will support a judgment if he elects to consider them and no objection is made."); *City Federal Savings & Loan Assn. v. Federal Home Loan Bank Bd.,* 600 F.2d 687, 688 (7th Cir. 1979); *Dedyo v. Baker Eng'g New York, Inc.,* 1998 WL 9376, at *5 (S.D.N.Y. 1998) ("'[a] court may, in its discretion, strike out portions or the entirety of affidavits . . . and other submissions which are not competent, even if a motion to strike has not been made'") (quoting 11 James W. Moore et al., *Moore's Federal Practice* ¶ 56.12[4][a] (3d ed. 1997); see also *Auto Drive-Away Co. of Hialeah, Inc. v. ICC,* 360 F.2d 446 (5th Cir. 1966) (court may choose to consider flawed affidavits in the absence of a motion to strike).

6

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the nonmovant has properly responded to a motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law

7

will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference

8

but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV. The McDonnell Douglas Framework.

This case involves the application of Title VII of the Civil Rights Act and 48 U.S.C. § 1981 to claims of racial discrimination. Plaintiff seeks to establish his claims based largely on circumstantial evidence, so the familiar framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) governs this court's inquiry.

Under the *McDonnell Douglas* framework, a plaintiff seeking to establish a claim based on circumstantial evidence has the burden of establishing a *prima facie* case of discrimination. "*Establishment of the prima facie case in effect creates a presumption* that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden of production then shifts to the defendant, requiring the defendant to articulate some "legitimate, nondiscriminatory reason" for the allegedly discriminatory employment action. *Id.* "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th Cir. 1991), *cert. denied*, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metal Co.*, 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Burdine*, 450 U.S. at 255 & n.10. The plaintiff must then prove by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere

9

pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. "[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly probative' evidence on the issue to avoid summary judgment." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989)) (other citations omitted) (alterations in original).

The plaintiff may prove that the defendant intentionally discriminated against him "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1445 (11th Cir.), *cert. denied*, 474 U.S. 1005 (1985)). However, "'to withstand a defendant's motion for summary judgment, a plaintiff has to do more than establish a prima facie case and deny the credibility of defendant's witnesses.'" *Howard v. BP Oil Co.*, 32 F.3d 520 (11th Cir. 1994) (quoting *Brown*, 939 F.2d at 950). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, nondiscriminatory reasons for its actions." *Isenbergh*, 97 F.3d at 444 (quoting *Young*, 840 F.2d at 830). Plaintiff must instead "produc[e] sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable."[8] *Howard*, 32 F.3d at

_____

[8]In other words, a defendant can carry its initial burden on summary judgment on the pretext issue by presenting extensive proof to support its legitimate nondiscriminatory reason. If the defendant can show that its preferred reason was the real reason, it need not prove a negative by showing that the plaintiff cannot prove

10

526.

If a plaintiff succeeds in this burden, the "disbelief of the defendant's proffered reasons, together with the *prima facie* case, is sufficient circumstantial evidence to support a finding of discrimination" and to preclude summary judgment. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997). Because of the difficult factual questions involved in assessing "an employer's true motivations," once the plaintiff has presented evidence raising a question about those motivations summary judgment is ordinarily inappropriate. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If evidence in the record "demonstrate[s] 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's preferred legitimate reasons for its action that a legitimate factfinder could find them unworthy of credence,'" the final assessment of the employer's motivation must be left to the jury. *Combs*, 106 F.3d at 1538.

## V. Discussion.

In this case, Mr. Young asserts that Wolverine discriminated against him by forcing his resignation from employment while not doing the same to white employees in similar situations. To prevail on his claim of disparate treatment due to race, Mr. Young must prove that similarly situated employees guilty of equivalent offenses were treated less harshly. *Holifield v. Reno*, 115 F.3d 1555, 1555 (11th Cir. 1997). In other words, to prove his *prima facie* case the plaintiff must show: 1) he belongs to a racial minority; 2) he was

pretext. Pretext and a legitimate reason are, after all, two sides of the same coin. Proof of one disproves the other.

11

qualified to do the job; 3) he was subjected to adverse job action; and 4) his employer treated similarly situated employees more favorably. *Id.* at 1555.

It is beyond dispute that Mr. Young is a member of a racial minority, and evidence that he was employed for 20 years shows to the court's satisfaction that he was qualified for the job he held. The plaintiff was effectively terminated from this job, clearly satisfying the third requirement. The crux of the dispute therefore lies in the fourth element of the above test.

The fourth element of the *Holifield* test requires a showing that the employer treated similarly situated workers more favorably. Mr. Young points to several instances in which he claims that white workers have been either not fired for failing a drug test or given a retest. As noted above, the plaintiff claims that Terry Stinson, Steve Proctor, Danny Smith, Bob Montgomery, Cecil Turner, and Glenn Bradford were examples of the more favorable treatment that whites received. Unfortunately for Mr. Young, however, he has absolutely no solid evidence regarding the treatment of these comparators. Mr. Young's entire case is based on hearsay and gossip. While such rumors may be enough to raise suspicion and begin the litigation process, "grapevine" evidence of this type is notoriously inaccurate and unreliable. As stories are passed around by word of mouth they have a tendency to become garbled, and important details tend to be forgotten. This type of evidence is therefore not admissible at trial. Without it, however, Mr. Young is left with nothing to contradict Wolverine's ample documented evidence that the company treated him the

12

same way it treated everyone else.[9]

Nor is Mr. Young's evidence of possible anti-union/anti-black bias at the company sufficient of itself to make out a case. Mr. Young claims that he was told by a supervisor that the administration of Wolverine needed to get rid of black employees to squelch the talk of forming a union. This evidence is likely inadmissible hearsay. More importantly, however, it does not in itself prove that Mr. Young was targeted for discrimination. There is a big difference between proving that management harbored some discriminatory sentiments and proving that a *particular* black employee, fired for what appears to be a perfectly valid reason under a well-established company policy, was actually the target of a plot to discriminate. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641-42 (11th Cir. 1998)(evidence of undirected racial hostility is at best circumstantial evidence). Mr. Young simply has no evidence to show that he was fired because of anything other than a positive drug test.

This does not mean, of course, that Wolverine did not in fact discriminate against Mr. Young. But this court must deal in evidence, in what can be proven. Mr. Young cannot prove discrimination here. Summary judgment will therefore be granted for the defendant.[10]

---

[9]Indeed, as noted above the documented evidence may even explain how the rumors got started. *See supra* note 5.

[10]The court also notices that the claims filed by Mr. Young may have been untimely under 42 U.S.C. § 2000e-5(f) since the plaintiff's right to sue letter indicates that it was sent by the EEOC on October 6, 1997 but the plaintiff did not file a lawsuit until April of 1998. However, Mr. Young apparently now swears (contradicting his past deposition testimony), that he did not receive the letter until January, months after the EEOC indicates it was sent. The court is skeptical, but in light of its disposition of the case sees no need to resolve this issue.

13

## VI. Conclusion

Accordingly, Wolverine's motions will be granted.   The court will enter an appropriate order in conformity with this opinion.

Done, this ____ of March, 1999.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

14